# W. C. ALEXANDER AND WIFE V. WILLIAM HAGEDORN.

No. A-2271. Decided February 1, 1950.
Rehearing overruled March 8, 1950.
(226 S. W., 2d Series, 996.)

566

Justices Smedley and Taylor dissenting.

Justice Hart not sitting.

*Wm. Yelderman,* of Austin, for petitioners.

The Court of Civil Appeals erred in holding that the matters pleaded by appellee, Hagedorn, in justification of his failure to answer plaintiffs' suit in the trial court, showed that the judgment in said cause was rendered against appellee without any negligence of his part and that he used diligence to prevent it. Also in its holding that the adverse judgment was suffered by appellee through fraud, accident or acts of the opposing party, wholly unmixed with any fault of his own. Puls v. Clark, 199 S. W. (2d) 811; Rogers v. Dickson, 176 S. W. 865; Hill v. Lester, 91 S. W. (2d) 1152; Kelly v. Wright, 188 S. W. (2d) 983.

*Richards & Richards* and *C. F. Richards,* all of Lockhart, *Hart, Brown & Sparks and J. H. Hart,* all of Austin, for respondent.

A void judgment may be set aside at any time, although it may have been corrected on appeal, and although petitioners alleged that the mule was on the highway in violation of the local law, of which courts do not take judicial knowledge, they failed to assert the various things necessary, as required by statute, to adopt the local law to the area where the accident happened and to bring such matter to the attention of the court. Witt v. Kaufman, 25 Texas Supl. 384; Glass v. Smith, 66 Texas 548; Missouri, K. & T. Ry. Co. v. Tolbert, 100 Texas 483, 101 S. W. 206; Austin Bros. v. Patton, 288 S. W. 182.

MR. JUSTICE BREWSTER delivered the opinion of the Court.

This is a proceeding by bill of review brought by William Hagedorn, respondent, against W. C. Alexander et ux., petitioners, to set aside a judgment rendered in their favor against respondent at a former term of court. A trial court judgment for Hagedorn was affirmed by the Court of Civil Appeals. 220 S. W. (2d) 196.

In the original suit, the Alexanders alleged that while they were riding on a public highway at night in their automobile and while they were meeting another automobile, a mule stepped from behind the latter vehicle and immediately in front of their own; that to avoid striking the mule, Mrs. Alexander was compelled to steer their automobile into a ditch, which action overturned the car causing damage to it and severe injuries to her; that Hagedorn was the owner of the mule and had permitted it to run at large and unattended upon the highway in violation of a local stock law.

Hagedorn was not born "in this country" and at the time of the trial of his bill of review was 75 years old, but he had lived in Gonzales, Hays and Caldwell Counties for 52 years. He cannot read or write the English language. So, when the citation was served on him in the damage suit, he requested the deputy sheriff to explain its meaning. The officer explained that it meant that the Alexanders were suing Hagedorn for damages. He told Hagedorn what they alleged in support of their demands and that the citation required Hagedorn to appear in district court at Lockhart on September 1, 1947, to answer the suit.

According to the trial judge's findings of fact, Hagedorn went to the district courtroom on September 1 but found nobody there, whereupon he went to the district clerk's office and told the clerk he was there to answer the Alexander's suit. The

clerk told Hagedorn that the district judge was not in Lockhart and that no court would be held that week. Asked by the clerk whether he had an attorney, Hagedorn replied that he did not. He then gave the clerk his address, requesting the clerk to notify him when to return to defend the suit. Hagedorn "understood that the Clerk would notify him when he should return to Lockhart for the purpose of defending" the suit but did not understand that he was required to employ an attorney or to do anything more than he had done in response to the process served on him." Then Hagedorn went home; he employed no attorney; and, receiving no word from the clerk "or from any other person" relative to the suit, he did nothing further about it until after April 1, 1948, when he learned that garnishment had been run against his bank account following a judgment rendered against him on December 8, 1947, three months and one week after he had his conversation with the clerk. Then he did employ attorneys and filed this action.

The trial court found that Hagedorn "had a complete and absolute defense" to the Alexanders' suit in that he did not own the mule and was not responsible for it being on the highway when the Alexanders' car was forced off the road; that the court would not have entered judgment for the Alexanders on December 8, 1947, if he "had not understood from the testimony given and the statements made to the Court at that time that defendant William Hagedorn admitted that the mule which was on the highway and which was alleged to have caused the accident * * * was his mule and was a mule for the custody of which he was responsible"; that when Hagedorn came to the courtroom on September 1, 1947, he came to inform the court that he did not own, and was not responsible for, the mule at the time of the accident; and that the mule belonged to, and was under the control of, Hagedorn's son, Robert, at the time of the accident, which fact was known to the Alexanders when they filed suit "and at all times thereafter."

Petitioners complain that the Court of Civil Appeals erred in holding that these facts showed that Hagedorn had suffered the judgment to be rendered against him "through fraud, accident or acts of the opposing party, wholly unmixed with any fault or negligence of his own."

■ Although the bill of review is an equitable proceeding, before a litigant can successfully invoke it to set aside a final judgment he must allege and prove (1) a meritorious defense to the cause of action alleged to support the judgment, (2)

which he was presented from making by the fraud, accident or wrongful act of the opposite party, (3) unmixed with any fault or negligence of his own. Garcia et al. v. Ramos et al. (Civ. App.), 208 S. W. (2d) 111 (er. ref.). Because it is fundamentally important in the administration of justice that some finality be accorded to judgments, these essentials have been uniformly recognized by our courts; therefore, bills of review seeking relief from judgments "are always watched by courts of equity with extreme jealously, and the grounds on which interference will be allowed are narrow and restricted"; and the rules are not to be relaxed merely because it may appear in some particular case that an injustice has been done. Harding v. Pearson Co. et al. (Com. App.), 48 S. W. (2d) 964. As said by the Supreme Court of California, "Endless litigation, in which nothing was ever finally determined, would be worse than occasional miscarriages of justice." Pico v. Cohn et al., 91 Cal., 129, 25 Pac., 970, 13 L. R. A. 336, 25 Am. St. Rep. 159.

■ Although negligence is a question of fact for the trial court, it is a question of law whether, when the facts are so established, they amount to *any* evidence to sustain that issue. Crawford v. Houston & T. C. R. Co., 89 Texas, 89, 33 S. W., 534; San Antonio Brewing Ass'n v. Wolfshohl (Civ. App.), 155 S. W., 644 (er. ref.) ; Houston E. & W. T. Ry. Co. v. Boone, 105 Texas, 188, 146 S. W., 533. So the question is whether respondent's conversation with the clerk and his understanding of its import, as found by the trial court, tend to show diligence on respondent's part in defending the suit.

"Reliance upon the statements or promises of third persons even though they may occupy some official position or seem to be in a position to have better information than the party himself, does not ordinarily entitle to relief for failing to make a defense." Freeman, Law of Judgments (5th Ed.), Vol. 3, Sec. 1245, p. 2592.

Under any other rule it would be very difficult if not impossible for a trial court to function in the field of default judgments. For it would mean that before the court could enter a valid judgment against a non-answering defendant, he would have to call in the clerk, the sheriff and perhaps all other courthouse officials and their deputies to ascertain whether any of them had made any extra-official agreement to notify the defendant when his case would be on call, *even though the judge, as is true in this case, may have no intimation whatever from any source that any such agreement has been made.* Obviously,

such a situation would be intolerable. As said by the Appellate Court of Indiana, in a case wherein defense counsel relied on the clerk of the trial court to inform him of the day of trial of his client's case, "If the arrangement made by the appellant with the clerk is respected, it will become a precedent, and whenever a like arrangement shall be made hereafter, and the clerk does not keep his promise, the courts will be placed under the imperative duty of giving relief. Such arrangements would probably become more frequent, because of the disposition of the officers of courts to be courteous and obliging to attorneys." Western Union Tel. Co. v. Griffin, 1 Ind. App. 46, 27 N. E., 113.

In Elton v. Brettschneider, 33 Ill. Ap., 355, appellant attacked a default judgment, alleging that he was summoned to the August term, went to the courtroom on the morning of the first Monday in August, but found no court in session and was told by *"various" officers of the court* that there would be no court until September 17; that he believed them, and his attorney being out of town he paid no more attention to the suit; that, therefore, he did not know until the term was over that judgment had been taken. The court said, "Equity can not give relief on such grounds. The appellee is not chargeable with the consequences of the appellant's ignorance or negligence."

The true rule is stated in 31 Am. Jur., Sec. 745, p. 286. "The failure of a clerk of court to inform a party or his attorney as to the status of a cause is ordinarily regarded as insufficient ground for the opening or vacating of a judgment resulting therefrom. This rule has even been applied where the clerk failed to answer letters inquiring about the status of the case, and where he failed to keep his promise to keep the party informed. On the other hand, relief has been granted where a judgment was rendered against a party in consequence of some mistake or fault of a clerk of the court, where there was no negligence on the part of the litigant, or where the negligence was excusable. This rule has been applied where a party has in good faith endeavored to ascertain from the clerk of the court the condition of the cause upon the court's calendar, and is honestly misled by information received. Thus, it has been decided to be proper to open a default against a defendant, where his attorney was informed by the clerk that no business would be transacted by the court until after a certain date, and relying upon this statement he did not appear until such date, when he found that his pending demurrer had been overruled."

■ This statement recognizes the difference between promises or statements made by the clerk within the scope of his official duties and those made outside of it. For example, it is not the clerk's official duty to undertake to keep a party informed as to the status of his case or when it will be reached on the docket. It is his official duty to know when sessions of the court will be held, what class of business will or will not be disposed of at a given time and what his office records show with respect to pending litigation, therefore when he gives an inquiring litigant the wrong information within that field the litigant is not at fault.

It is declared in 164 A. L. R., p. 552, subdivision a, of Annotation III: "If it can be called as much, the only rule which can be stated, in respect of relief from a judgment on the ground of misinformation by the clerk of the court as to the status of the case or as to the time of trial or hearing, is that each case depends upon its own particular or peculiar circumstances." But a study of the seven cases cited in subdivision b, of the note, as granting relief on such misinformation, discloses that in all of them the "particular or peculiar circumstances" demanding relief arose in that field wherein it was the official duty of the clerk to act. For example, in Yerkes v. Dangle, by a superior court of Delaware, 42 Del. 362, 33 Atl. 2d., 406, the defendant alleged that in April, 1942, a deputy sheriff read to him a paper to the effect that plaintiff had sued him and that he should appear on May 4; on that day he went to the Court of Common Pleas, where he was told that no action was pending there against him; then he went to the Superior Court room, where he was given the same answer; and then, at the direction of the sheriff's office, he went to the Prothonotary's office, where an "official" told him that no action was pending there against him and that "he should go home and forget about it." The court held that "litigants are entitled to rely on statements by officials charged with the custody and control of papers and records relating to judicial proceedings in which they are interested, and about which information is sought, and that a judgment by default will be opened if it is due to the inaccuracy of information given by such officials." In Hog's Back, etc. Co. v. New Basil, etc. Co., 65 Cal. 22, 2 Pac., 489, on former appeal, the Supreme Court of California had given appellant 20 days after the filing of a remittitur in the trial court in which to file his answer; the remittitur was filed March 14 but the clerk failed to make a note of its filing in his official records, and it was not until April 7, after 20 days had elapsed, that appellant learned of its filing, although he had meantime

made frequent inquiries at the clerk's office as to whether it had been filed or when it would be filed and was informed (because of the clerk's failure to make the entry in his official records) that remittitur had not been filed nor could it be filed until March 25; default judgment was entered because appellant had not answered within 20 days after March 14. It was held that appellant had the right to rely on the clerk's information that the remittitur of March 14 had not been filed, "coming as it did from an officer having custody of the records, where an entry should regularly have been made." In McCall v. Hitchcock, 72 Ky. (9 Bush) 66, Hitchcock and his business associates were sued in a number of cases, one of them being a suit against him by McCall. Seeing that some papers served on him were processes in suits against him, but apparently not reading them, Hitchcock became enraged and tore up the papers. But the next day he engaged an attorney to represent him and his associates in all pending suits. He and his attorney went to the court clerk's office and asked for the papers in all these suits; a deputy clerk produced the papers in several of them, being assisted in his search by one of McCall's attorneys. Hitchcock told the deputy that he thought there was a suit against him by McCall, but after further search the deputy failed to find it. It was held that although Hitchcock had wrongfully torn up papers which would have informed him of McCall's suit he had later used "ordinary prudence" to learn of it and was en-entitled to relief against a judgment later rendered against him. In Logan v. Southall, 137 Iowa, 372, 115 N. W., 19, Southall was served on June 16 with notice that Logan would file his petition in a suit against Southall, in the office of the clerk of the district court, on and before August 21 and unless Southall appeared on the second day of the term beginning August 31, default judgment would be entered. The petition was filed on August 18. On August 21 Southall wrote the district clerk, reciting the notice that had been served, and asked "if there has been any such paper filed against me." The next day the clerk replied in the negative. So Southall did not answer the suit and default was later entered against him. Southall knew nothing of this judgment until execution issued, whereupon he filed his petition alleging a meritorious defense, setting up the foregoing facts as an excuse for not defending the suit and asking that the judgment be set aside. It was held that Southall had sought and received information from an officer charged with custody of the papers, relating to which information had been sought, and was entitled to rely on it. In Carter v. Grimmet, 89 Okla., 37, 213 Pac. 732, the defendant in an action for possession of land was notified by the clerk's office that the

case had been dismissed for want of prosecution, hence he paid no further attention to it and did not know that it had subsequently been reinstated and judgment entered until writ of possession had issued against his tenant. It was held that defendant had been misled by an officer of the court and could not, therefore, be charged with lack of diligence. Clearly none of these cases deals with a non-official, gratuitous undertaking by the clerk such as is presented in the case at bar. The other two cases cited in the A. L. R. note, supra, are Texas cases: Lanius v. Shuber, 77 Texas, 24, 13 S. W., 614, and Panhandle Motors Co. v. Foster (Civ. App.), 245 S. W., 269. Both, however, have to do with a motion for new trial rather than with a bill of review.

■ When respondent requested the district clerk to notify him when he should return to court to defend the suit he was requesting the clerk to undertake something that the latter was in no sense required to do in his official capacity. So, as to that, the clerk became respondent's agent, and negligence of the clerk must be charged to respondent; it became his own negligence.

Garcia et al. v. Ramos et al., supra (208 S. W. 2d, 111), which got the unqualified and very recent approval of this court, is as nearly on all fours with this case as any case may well be. There the plaintiffs, in attacking a default judgment under which they were about to be evicted from their homestead, alleged that they were aged Spanish-Americans and ignorant of court proceedings; that they were told by the deputy sheriff who served the citations that they need not appear until he notified them; that they relied on this and on the good faith of their relatives, the plaintiffs in the original suit, to make full disclosure of their rights to the trial court but that these relatives *perjuriously concealed* those rights from the court; that because of these facts the default judgment was rendered. The Court of Civil Appeals held that although Garcia et al. had alleged a good defense to the cause of action, they had *failed to allege facts which showed that they were prevented from that defense by fraud, accident or the wrongful act of Ramos et al, unmixed with any negligence of their own.* Then the court added: "They allege that they depended upon the deputy sheriff to notify them when to come to court. In doing so they made him their agent, and when he neglected to so notify them it was the negligence of their own agent. It is not shown that appellees were in anywise responsible for the deputy sheriff making such promise or for his failure to keep his promise."

In that case the complaining parties did everything that the respondent in this case did. They talked with a court official and got his promise to notify them when to appear in court; respondent talked to a court official, requested him to notify respondent when to return to court to defend the suit and *"understood"* that the official would do so. It is true that respondent came to the courtroom on the day commanded in the citation, but after his conversation with the clerk he returned home and for the ensuing three months and one week before judgment was rendered against him he did exactly what Garcia et al. did: he waited for the court official to fulfill his extra-official undertaking to notify him when to come to court.

■ Again, Hagedorn cannot prevail because he has not shown that he was prevented from making his defense to the Alexanders' suit by their fraud or wrongful act.

Fraud in its relation to attacks on final judgments is either extrinsic or intrinsic. Only extrinsic fraud will entitle a complainant to relief because it is a wrongful act committed "by the other party to the suit which has prevented the losing party either from knowing about his rights or defenses, or from having a fair opportunity of presenting them upon the trial. Such, for instance, as where he has been misled by his adversary by fraud or deception, did not know of the suit, or was betrayed by his attorney. In other words, fraud which denied him the opportunity to fully litigate upon the trial all the rights of defenses he was entitled to assert. 'Intrinsic fraud' in the procurement of a judgment is not ground, however, for vacating such judgment in an independent suit brought for that purpose. And within that term is included such matters as fraudulent *instruments, perjured testimony, or any matter which was actually presented to and considered by the trial court in rendering the judgment assailed."* State v. Wright (Civ. App.), 56 S. W. (2d) 950, which was cited with approval and substantially quoted by this court in Crouch et al. v. McGaw, 134 Texas, 633, 138 S. W. (2d) 94.

The Supreme Court of the United States gives these illustrations of extrinsic fraud: "Where the unsuccessful party has been prevented from exhibiting fully his case, by fraud or deception practiced on him by his opponent, as by keeping him away from court, a false promise of a compromise; or where the defendant never had knowledge of the suit, being kept in ignorance by the acts of the plaintiff" and then says: *"The court will not set aside a judgment because it was founded on a fraudulent instrument, or perjured evidence, or from any matter*

*which was actually presented and considered in the judgment assailed.* (Italics ours.) United States v. Throckmorton, 98 U. S., 61, 25 L. Ed., 93.

In Phillips Petroleum Co. v. Jenkins, 91 Fed. (2d) 183, 187, it is said that extrinsic fraud is wrongful conduct of the successful party *practiced outside of an adversary trial and which is practiced directly and affirmatively upon the defeated party,* or his agents, attorneys or witnesses.

That intrinsic fraud arises only in relation to "questions examined and determined in the action", or to "the matter on which the judgment was rendered", has been declared in other jurisdictions. For example, see Caldwell v. Taylor, 218 Cal. 471, 23 Pac. (2d) 758, 88 A. L. R., 1194; Pico v. Cohn, supra; Clark v. Clark, 64 Mont. 386, 210 Pac., 93. In fact, the principle is so generally applied that Freeman states in his Law of Judgments (5th Ed.,), Vol. 3, p. 2567, that judgments are not impeachable for frauds *relating to the merits between the parties;* that all mistakes and errors must be corrected from *within* by motion for a new trial, or to reopen the judgment, or by appeal; that the fraud which will otherwise relieve must be in some matter *other than the issue in controversy* in the action.

■ This wealth of authority compels the conclusion that the wrongful act of petitioners in stating to the trial court in the default judgment proceedings that respondent admitted ownership of the mule was intrinsic fraud. The fundamental issue which petitioners had to establish in order to prevail in the original suit were : (1) that respondent owned a mule, (2) which he permitted to run at large in violation of law, (3) thereby proximately causing the damages sued for. When respondent defaulted, all of them were to be taken as proved and admitted and the right of petitioners as well as the liability of respondent was foreclosed, except as to the amount of damages. Southern S. S. Co. v. Schumacher (Civ. App.), 154 S. W. (2d) 282 (er. ref. want merit) ; Johnson v. Brown (Civ. App.), 218 S. W. (2d) 317 (er. ref. n. r. e.). Nevertheless respondent's ownership of the mule remained an essential element of the cause of action alleged by petitioners. The cautious trial judge recognized this when, although the law says the issue was to be taken as confessed, he required assurance that respondent owned the mule. That he was satisfied by an unsworn statement by petitioners and did not require their testimony under oath does not alter the fact that it related to a basic phase of the case; it still had to do with the merits between the parties.

We fail to see how any statement made by petitioners that respondent had admitted ownership of the mule, made to the trial judge for the purpose of getting a default judgment, could be extrinsic fraud if made without the sanction of an oath, but intrinsic fraud if made under that sanction.

At one point in his findings the trial court states that if he had not "understood from the *testimony given and statements made* to the court at that time" that respondent admitted ownership of the mule he would have postponed the case. Under that version of what happened, we cannot hold that the "testimony given" was intrinsic fraud but that the "statements made" were extrinsic fraud, when the testimony was given and the statements made at the same place and time, for the same purpose and on the same issue.

Having wholly failed to establish two of the three essential elements of a cause of action for bill of review, respondent is not entitled to recover.

Accordingly, both judgments below are reversed and judgment is rendered for petitioners.

Opinion delivered February 1, 1950.

MR. JUSTICE SMEDLEY, joined by Justice Taylor, dissenting.

I find it impossible to agree to the opinion of the majority and the judgment reversing and rendering the judgments of the Court of Civil Appeals and the District Court, because that opinion and the resulting judgment treat the applicable equitable rules as inflexible rules, ignoring the fact that the rules of equity are in a measure flexible and adaptable to particular exigencies. In doing so the Court is permitting one party in this case to suffer gross wrong at the hands of the other party, and is denying to this Court, although it is a court of equity and this is an equitable proceeding, authority to apply the established rules to the peculiar facts of this case in such way as to prevent gross injustice. I do not suggest that the rules be changed or disregarded, but only that they should be reasonably and fairly adapted and fitted to the facts of the case. If this cannot be done, what is a court of equity for?

The majority admit and must admit that respondent Hagedorn had and has a meritorius defense to the original suit. The trial court found from abundant evidence that respondent Hagedorn "had a complete and absolute defense." He did not own

the mule that caused the accident and he did not permit it to run at large. According to the opinion of the majority respondent is required to pay to petitioners more than $3,000.00 as damages for which he was in no way responsible.

The opinion of the majority, in denying to respondent relief from the default judgment rendered against him, holds first that the fraudulent or wrongful act on the part of petitioner Alexander was intrinsic rather than extrinsic fraud and, second, that respondent was not sufficiently diligent in defending against the original suit.

As to the first of these holdings, the material facts found by the trial court are as follows: When he was served with citation in the original suit respondent Hagedorn, being uneducated and not able to read or write, requested the deputy sheriff to explain to him what the citation meant, and was told that petitioners were suing him for damages, alleging that he was the owner of the mule which was struck by them on the highway, with resulting injuries to them, and that the citation required him to be in the courthouse in Lockhart, Texas, on September 1, 1947, and at that time to appear in the District Court.

Respondent went to the district courtroom in the courthouse at Lockhart on September 1, 1947, for the purpose of informing the court that he did not own the mule and was not responsible for the mule's being on the highway. Finding no one in the courtroom, he went to the office of the district clerk and told him that he had come to the courthouse in obedience to the notice served on him to appear in the District Court on September 1, 1947, to answer in the suit which petitioners had filed against him. The clerk told him that the district judge was not in Lockhart and that no district court would be held there during that week. When asked by the clerk whether he had an attorney, respondent told him he did not, and he gave the clerk his address, requesting the clerk to notify him when he should return for the purpose of defending the suit. The clerk took respondent's address, and respondent understood that the clerk would notify him when to return. Respondent did not understand that he was required to employ an attorney or to do anything more than he had done in response to the process that had been served on him. He did not employ an attorney and returned home. He received no word from the district clerk or from any other person concerning the suit, and did not know that any action had been taken in the suit until he learned early

in April, 1948, that petitioners, on December 8, 1947, had taken a judgment against him in that suit for $3,126.84.

On December 8, 1947, petitioners and their attorney appeared in the District Court of Caldwell County and requested the Court to render default judgment in their favor against respondent, and at that time it was stated to the Court either by petitioners or their attorney that respondent Hagedorn admitted that the mule which was on the highway was his mule and was under his control. These statements were made, although petitioner Alexander, even before the suit was instituted, knew that the mule was the property of Robert Hagedorn (not respondent William Hagedorn) and that Robert Hagedorn had admitted that he owned it and that the mule had escaped from his premises at the time it was on the highway. The judge who rendered the judgment in the original suit and who tried this case states in his findings of fact that if these statements had not been made to him by petitioner Alexander or his attorney he would have postponed the hearing in the original suit "until defendant William Hagedorn should be notified of the facts that the suit would be tried at a certain time".

Thus the wrongful act of petitioner was a false statement made to the district judge for the purpose of inducing him to hold the hearing in the absence of respondent Hagedorn. It did induce the district judge to proceed, and but for that statement no hearing would have been held and no judgment would have been rendered. It is very clear that petitioner's statement was extrinsic rather than intrinsic fraud. By it respondent Hagedorn was deprived of the opportunity which the trial judge undoubtedly would have given him to appear and show that he had a complete defense. Respondent not having answered, there was no occasion for the introducing of evidence bearing upon liability. The trial judge could have heard evidence merely as to damages without inquiry as to ownership of the mule, but being careful and conscientious he hesitated to hold the hearing in respondent's absence and without giving him opportunity to be present, and he would not have proceeded if the representation that respondent admitted ownership of the mule had not been made either by petitioners or by petitioners' attorney. The wrongful act, the statement made before the hearing began, was extrinsic in that it was the inducement for the court to proceed in respondent's absence and was not evidence offered to prove a fact in issue.

The opinion of the majority seizes upon a statement made at one place in the trial judge's findings that he would not have

rendered the judgment in the original suit "if the court had not understood from the testimony given and statements made to the court at that time" that the defendant admitted ownership of the mule. And the opinion argues therefrom that the wrongful act of petitioner must be considered intrinsic fraud rather than extrinsic fraud because it was false testimony given at the hearing on the issue of ownership. This is an unnecessary straining in support of an inequitable and unjust judgment. If the phrase quoted from the findings means that after the trial judge decided to hold the hearing the petitioner, when testifying to the amount of damages, repeated in his testimony the false statement that he had made before the hearing was begun to induce the judge to proceed with the hearing, the fact remains, clearly shown by the findings, that before the hearing was begun petitioner Alexander or his attorney made the false statement that respondent had admitted ownership of the mule and that only because that statement was made did the trial judge proceed to hold the hearing and render judgment against respondent in his absence. The distinction between extrinsic fraud and intrinsic fraud in bill of review cases is very clearly drawn in the decisions. Crouch v. Panama Refining Co., 134 Texas 633, 138 S. W. (2d) 94; Mohammed v. McDonald, 214 S. W. (2d) 896; State v. Wright, 56 S. W. (2d) 950; United States v. Throckmorton, 98 U. S. 61, 25 L. Ed. 93. Relief is granted when, as here, a party by the wrongful or fraudulent act of the other party has been prevented from presenting his case or defense to the court. It is not granted on account of perjured testimony on the trial. It is of no consequence in this case whether there was or was not perjured testimony at the hearing. The point is that the false statement made before the hearing, and that only, induced the court to proceed to hold the hearing and to render judgment in respondent's absence. There is no sound reason for the action of the majority in holding that the statement made before the hearing was intrinsic fraud, and not extrinsic fraud, merely because there may have been, or was, intrinsic fraud in the making of a like statement in the testimony at the hearing.

The opinion of the majority denies relief to respondent on the further ground that he was not diligent in appearing to make defense to the original suit. The facts as to what he did after he was served with citation have been stated above. The further facts, as shown by the trial court's findings and supported by evidence, are: Respondent is seventy-five years old. He was not born "in this country". He cannot read or write the English language. His testimony shows that he is unedu-

cated and not well informed. When he appeared at the courthouse on September 1, 1947, in answer to the citation and found that the district judge was not in Lockhart and that no court would be held during that week, he gave his address to the district clerk and requested the clerk to notify him when he should return for the purpose of defending the suit. He understood from his conversation with the clerk that the clerk would notify him when to return. He did not understand that he was required to employ an attorney or to do anything more than he had done in response to the process that had been served on him.

If this were an action at law, as for example a suit for damages caused by negligence, the conduct of the parties with respect to negligence would be measured by the conduct of the ordinary, reasonable man. And the majority have made the mistake of applying that measure to respondent's conduct and of holding as a matter of law that respondent was negligent, notwithstanding the trial court's finding that he was not. But this proceeding is a suit in equity. It is permitted to prevent manifest injustice. As observed by the Court of Civil Appeals, the question whether or not respondent was negligent was one of fact for the trial court. See also Stewart v. Byrne, (Com. App.) 42 S. W. (2d) 234; Gray v. Moore, 172 S. W. (2d) 746. Each case of this class presents features differing somewhat from all others, and because of its peculiar facts one case rests upon stronger grounds for equitable relief than does another. Dallas Development Co. v. Reagan, 25 S. W. (2d) 240. In these cases, as in all other cases governed by equitable principles, the trial courts are permitted a measure of discretion, not an unbridled discretion to decide cases as they may deem proper, but discretion within the bounds of the settled guiding rules. Craddock v. Sunshine Bus Lines, 134 Texas 388, 393, 133 S. W. (2d) 124. Within these bounds is a limited field for the application of equitable principles to the facts of the particular case. There are a number of decisions where bills of review are supported and relief granted when what under other circumstances would be negligence on the part of the defendant or his attorney is considered in the peculiar facts of the case to be excusable negligence. See Dallas Development Co. v. Reagan, 25 S. W. (2d) 240; Hubbard v. Tallal, 127 Texas 242, 92 S. W. (2d) 1022, facts set out in opinion of Court of Civil Appeals, 57 S. W. (2d) 226; Nachant v. Montieth, 117 Texas 214, 299 S. W. 888. See also Kelly v. Ward, 94 Texas, 289, 297, 60 S. W. 311.

In Warren v. Osborne, 154 S. W. (2d) 944, reformation of deeds was sought on account of mutual mistake, and the re-

lief was granted regardless of a jury finding that the parties seeking it were negligent in not discovering the errors in the deeds. Associate Justice Williams, in affirming the judgment of the trial court granting the relief, quoted with approval from a Montana decision (Cox v. Hall, 54 Mont. 154, 168 P. 519) as follows:

"Courts of equity are not bound by cast-iron rules, but are governed by rules which are flexible and adapt themselves to particular exigencies, so that relief will be granted when, in view of all the circumstances, to deny it would permit one party to suffer a gross wrong at the hands of the other."

In expressing the final conclusion of the Court of Civil Appeals, Justice Williams said:

"After due consideration of all the circumstances reflected by the evidence in this case; the inexperience of the litigants and scriveners in dealing with royalty and the deeds; the confusion which naturally arose from Mrs. Warren's interest of an undivided 1/8; and after weighing the resulting injustice of a denial of reformation, such alleged negligence as here is excusable and will not defeat the interposition of equity to carry out the mutual intent and prevent a gross injustice."

In view of the principles mentioned and the authorities cited above, I am firmly convinced that the Court, in deciding the question whether respondent was negligent, should take into consideration all of the facts, including respondent's handicaps, his age, his want of information and of education, and his inexperience with courts and litigation.

There is authority for the foregoing conclusion. Early v. Burns, 142 S. W. (2d) 260, application for writ of error refused, in approving a judgment of the trial court which set aside on bill of review a judgment in trespass to try title rendered against the appellees, and in holding that there was evidence to support the trial court's finding of due diligence on the part of the appellees, took into consideration the fact that they were "ignorant negroes". In Warren v. Osborne, 154 S. W. (2d) 944, a suit to reform a deed, the Court of Civil Appeals named the inexperience of the litigants and scriveners in dealing with royalty and the deeds as one of the circumstances which induced it to affirm the judgment of the trial court in favor of those who sought reformation, notwithstanding a finding of the jury that they were negligent in not discovering errors in the deeds. See also Ramirez v. Martinez, 208 S. W. 380. In prin-

ciple, there is support for the conclusion in the cases which permit the reopening by bill of review, where the equities demand it, of judgments rendered in suits brought for minors by next friend, (Missouri-Kansas-Texas Railroad Co. v. Pluto, 138 Texas 1, 156 S. W. (2d) 265; Greathouse v. Fort Worth & Denver Ry. Co., Com. App., 65 S. W. (2d) 762) ; and in tort cases, holding that the conduct of a child, in one case eleven years old and in another case six years old, on the issue of his contributory negligence, is to be measured by that of the ordinary prudent person of like age, experience, intelligence and capacity and not by the conduct of the ordinarily prudent adult. Dallas Ry. & Term. Co. v. Rogers, 147 Texas 617, 218 S. W. (2d) 456; Dr. Pepper Bottling Co. v. Rainboldt, 66 S. W. (2d) 496.

Respondent was diligent to the extent of his capacity, understanding and information. Following the deputy sheriff's explanation to him that the citation meant petitioners had sued him for damages, claiming that he was the owner of the mule which caused the accident, and that he was required to appear in the district courtroom on September 1, 1947, he went to the courthouse and the district courtroom on the morning of that day for the purpose of obeying the citation and making known to the court that he was not the owner of the mule. Finding no one in the courtroom, he sought out the clerk of the court and explained to him the reason why he had come to the courthouse. When told by the clerk that the judge was absent and there would be no court held that week, he gave the clerk his address and requested him to notify him when he should return for the purpose of defending the suit, and the clerk caused him to understand that he would be notified. He was not notified and the record indicates that the clerk did not make known to the district judge that respondent had come to the courthouse in answer to the citation and did not make an entry showing that respondent had appeared. It is clear from this record that had the clerk made such an entry or called to the attention of the district judge the fact that respondent had thus appeared to answer the citation, the judgment would not have been rendered against respondent in his absence.

The trial court found that *"William Hagedorn did not understand that he was required to employ an attorney or to do anything more than he had done in response to the process served on him."* Under these circumstances, and in view of respondent's meager information and his inexperience, he could not be expected to anticipate that the case would be heard without notice to him and a judgment rendered against him for damages in a

very substantial amount for which he was in no way liable. Under the record in this case a court of equity should not be required by too strict an application of a common law measure of negligence to enter a decree which, to use the language of the trial judge, would be "inequitable and unjust" and would "result in a miscarriage of justice."

The opinion of the majority relies strongly upon Garcia v. Ramos, 208 S. W. (2d) 111, in which the allegations of a bill of review, held insufficient, presented facts somewhat similar to those of the instant case. That case may fairly be distinguished from this case. There the allegations as to diligence were meager and little more than conclusions, and they showed that the petitioners took no steps whatever to appear or to answer the suit. Here the facts as to respondent's diligence, and particularly as to his understanding and information, are fully developed by the evidence and set out in the trial court's findings of fact, and respondent did make appearance at the courtroom in answer to the citation and to make known his complete defense. In that case the court treated the allegation that the opposing parties failed to make disclosure of the petitioners' rights as the equivalent of perjury, and held that perjured testimony is intrinsic fraud which does not furnish a ground, in an independent suit brought for that purpose, for setting aside a judgment. In the instant case, as has been shown, the wrongful act of petitioners which induced the trial court to hear their evidence as to damages and to render judgment in respondent's absence was extrinsic fraud.

The careful and able trial judge and the Court of Civil Appeals rendered correct judgments in this case. The settled rules do not require the rendition of the harsh and inequitable judgment that this Court in rendering. There would be no departure from the rules and the working of gross injustice would be avoided if only the rules were applied fairly and reasonably to the facts of this case. The judgments of the District Court and the Court of Civil Appeals should be affirmed.

Opinion delivered February 1, 1950.

Rehearing overruled March 8, 1950.